2016 IL App (2d) 150823
No. 2-15-0823
Opinion filed June 23, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| AUTO-OWNERS INSURANCE COMPANY, as Subrogee of Eric B. Bettag, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 11-AR-1218 |
| RICHARD J. KONOW, | ) ) | |
| Defendant and Third-Party Plaintiff-Appellee | ) ) ) | |
| (Eric B. Bettag and Joseph Sauber, Third-Party Defendants-Appellants). | ) ) ) | Honorable Joseph M. Grady, Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hutchinson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Third-party defendants, Eric B. Bettag and Joseph Sauber, appeal from a judgment for $28,000.38, entered following a bench trial in the circuit court of Kane County, in favor of defendant and third-party plaintiff, Richard J. Konow. Konow's third-party claim was part of a subrogation lawsuit filed by plaintiff, Auto-Owners Insurance Company (Auto-Owners), against Konow, seeking recovery for property damage to a motor vehicle owned by Bettag and insured by Auto-Owners. On March 13, 2007, a motor vehicle operated by Konow collided with Bettag's vehicle. Bettag was seriously injured in the collision. When Auto-Owners commenced

this lawsuit, Konow's insurer had already paid the policy limits of his coverage for the collision to Bettag and his wife, Joan, to settle a lawsuit (the Bettag lawsuit) seeking recovery for Bettag's injuries, Joan's loss of consortium, and property damage to Bettag's vehicle. Konow's third-party claim in the present case sought recovery from Bettag and Sauber under the theory of negligent misrepresentation. Konow alleged that a letter from Sauber to Konow's attorney concerning disbursement of the settlement proceeds falsely represented that all "lien claims" had been settled when, in fact, Bettag had not reached any agreement with Auto-Owners with respect to its subrogation rights. On appeal, Bettag and Sauber argue that they owed no duty to Konow that would support recovery under the theory of negligent misrepresentation. We reverse.

¶ 2    The record reveals that the complaint in the Bettag lawsuit, as amended, alleged that "Eric Bettag's automobile was destroyed and rendered worthless and Eric Bettag has been deprived of the use of the automobile from the date of the collision." The amended complaint included a *respondeat superior* claim against Konow's employer. On March 16, 2009, Auto-Owners filed a complaint in intervention in the Bettag lawsuit, naming Konow as defendant. Paragraphs 5 through 7 of the complaint in intervention alleged as follows:

> "5. In his Complaint, the Plaintiff BETTAG has alleged that KONOW was guilty of negligence and other wrongful acts, which conduct caused the accident resulting in his injuries. In his Complaint, the Plaintiff seeks compensatory damages including damages for his injuries and the destruction of his vehicle.
>
> 6. Pursuant to the policy of insurance between BETTAG and AUTO OWNERS, AUTO OWNERS is entitled to recover from the proceeds of the above-captioned action for the value of benefits and services provided to or on behalf of NAKLICKI [*sic*] for

benefits paid and treatment of the injuries he sustained in the Accident ($5,000.00), as well as the damages paid for the destruction and loss of his vehicle ($29,800.38). ***

7. If it is ultimately determined that [Konow] was guilty of negligence in said accident which resulted in the injuries sustained by BETTAG and for which AUTO OWNERS provided necessary benefits and services, then AUTO OWNERS is entitled to receive from the Defendants, the value of benefits and services paid under the [policy] to or on behalf of BETTAG for benefits paid and treatment of the injuries he sustained in the Accident."

¶ 3    On August 11, 2009, in exchange for the payment of $3 million, the Bettags executed a release of "any and all claims *** which they have had, now has [*sic*], or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, loss of consortium, loss of service and property damage, and the consequences thereof, resulting or to result from [the March 13, 2007, collision]."   On September 10, 2009, Sauber wrote a letter to Mark A. Pheanis, the attorney representing Konow in the Bettag lawsuit.  The letter (which was written on the letterhead of Sauber's law firm, Shearer and Agrella) stated in pertinent part:

"[W]e have resolved all lien claims with respect to [the Bettag lawsuit].  Enclosed you will find letters confirming the 'settlement amounts' with respect to each lien.  Further, this letter will serve as this firm's acknowledgment of the amount due on its attorney's lien.

Please have [Konow's insurer] issue the following checks in the following amounts:

BlueCross BlueShield                         $   120,000.00

| | |
|---|---|
| Rehabilitation Institute of Chicago | $ 74,779.10 |
| Delnor Community Hospital | $ 16,000.00 |
| Auto Owners Insurance Company | $ 3,333.33 |
| Shearer & Agrella | $ 600,000.00 |
| Eric Bettag | $2,185,887.57" |

¶ 4    Konow's insurer tendered the settlement drafts.  In a letter to both Sauber and Pheanis dated October 21, 2009, Auto-Owners' attorney, Julie Line Bailey, wrote in pertinent part as follows:

> "It is our understanding that [Konow's] insurer has tendered a Three Million Dollar policy to [the Bettags].  Auto-Owners did receive a check for $3,333.33, representing its $5,000 medical payments lien, less a one-third deduction for attorney's fees pursuant to the common fund doctrine.  Auto-Owners has yet to receive any payment for its collision claim, recovery of which was also expressly sought by plaintiff Bettag in *** the Amended Complaint.

> Because [the Bettags'] Amended Complaint sought recovery of the collision damages, Auto-Owners was willing to reduce its collision claim by one-third ($19,008.25) for attorney fees pursuant to the common fund doctrine.  However, Joe Sauber advised me by telephone yesterday that his client is refusing to reimburse Auto-Owners for the total loss payments from the Three Million Dollar policy tender, and that Auto-Owners should take whatever legal methods it felt necessary to collect the collision lien.  In previous conversations with Mr. Pheanis, he indicated that the policy tender was intended to effect a settlement of both actions in their entirety, which would include the collision claims in both complaints."

¶ 5    At this point, we find it appropriate to take judicial notice of our own records (see *People v. Eubanks*, 283 Ill. App. 3d 12, 24 (1996)) in order to describe subsequent events in the Bettag lawsuit that are outlined in our decision in *Bettag v. Konow*, 2011 IL App (2d) 101188-U. As we noted in that decision, on December 23, 2009, Auto-Owners filed an amended complaint in intervention seeking recovery from the Bettags. *Id.* ¶¶ 5-6. Auto-Owners alleged that, by executing a release of their claims against Konow and his employer, the Bettags violated a provision of the policy prohibiting them from doing anything to prejudice Auto-Owners' subrogation rights. *Id.* ¶ 6. The trial court entered summary judgment for Auto-Owners on its claims against the Bettags and dismissed Auto-Owners' remaining claims in the Bettag lawsuit without prejudice. We reversed the summary judgments against the Bettags, reasoning that the release executed by the Bettags did not foreclose Auto-Owners from seeking recovery from Konow and his employer. *Id.* ¶ 10.

¶ 6    Auto-Owners thereafter filed the subrogation lawsuit giving rise to this appeal. Konow alleged that Bettag, "through" Sauber, advised Pheanis that all liens related to the underlying negligence lawsuit had been resolved. The matter proceeded to a bench trial. As pertinent here, Pheanis testified at trial that, when a personal-injury/property-damage lawsuit is settled, the plaintiff's attorney customarily informs defense counsel of any liens to be satisfied from the settlement proceeds. The trial court entered judgment for Auto-Owners against Konow in the amount of $28,000.38. The court also entered judgment in the same amount for Konow on his third-party claim against Bettag and Sauber. Bettag and Sauber filed a timely notice of appeal from the judgment on Konow's third-party claim.

¶ 7    As noted, Konow proceeded against Bettag and Sauber on a theory of negligent misrepresentation. "To state a claim for negligent misrepresentation, a plaintiff must allege: (1)

a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill. 2d 326, 334-35 (2006). Furthermore, "[w]here *** purely economic damages are sought, this court has imposed a duty on a party to avoid negligently conveying false information only if the party is in the business of supplying information for the guidance of others in their business transactions." *Id.* at 335.

¶ 8    The allegedly false statements giving rise to Konow's claim were made by Sauber. There is no allegation that Bettag personally made any false statements; Konow alleged that Bettag made the statements "through" Sauber. We must therefore consider whether Sauber owed a duty to communicate accurate information to Konow. In a negligent-misrepresentation lawsuit, this duty exists when the plaintiff and the defendant "stand in such a relationship that the law imposes upon the defendant an obligation of reasonable conduct for the plaintiff's benefit." *Kelley v. Carbone*, 361 Ill. App. 3d 477, 480 (2005). The existence of a duty is a question of law, so our review is *de novo*. *Vancura v. Katris*, 238 Ill. 2d 352, 373-74 (2010).

¶ 9    The relationship here is that of a litigant (Konow) and counsel for the opposing party (Sauber). Traditionally, the requirement of privity prevented an attorney from being held liable to a nonclient for negligent acts performed while representing a client. *Pelham v. Griesheimer*, 92 Ill. 2d 13, 19 (1982). In *Pelham*, our supreme court reexamined that requirement, noting that "[t]he trend in tort law has been to abolish privity of contract [citation] as a prerequisite to establishing a duty." *Id.* at 20. However, the court recognized the countervailing concern that

"liability for negligence not extend to an unlimited and unknown number of potential plaintiffs." *Id.* The court concluded that "the best approach is that the plaintiffs must allege and prove facts demonstrating that they are in the nature of third-party intended beneficiaries of the relationship between the client and the attorney in order to recover in tort." *Id.* The court reasoned as follows:

"Analogizing the scope of the duty to the concept of a third-party direct beneficiary serves the purpose of limiting the scope of the duty owed by an attorney to nonclients. The key consideration is the attorney's acting at the direction of or on behalf of the client to benefit or influence a third party. [Citation.] In *Clagett v. Dacy*, [420 A.2d 1285, 1289 (Md. App. 1980)], a legal malpractice action, the court stated:

'Whether the action is based upon a contract (express or implied), to which the traditional rules relating to third party beneficiaries may apply, or more on a theory of negligence—the violation of a duty not founded exclusively upon contract—there still must be shown *** that the plaintiff, if not the direct employer/client of the defendant attorney, is a person or part of a class of persons specifically intended to be the beneficiary of the attorney's undertaking.'

We conclude that, for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party. Under such proof, recovery may be allowed, provided that the other elements of a negligence cause of action can be proved. [Citation.]" *Id.* at 21.

¶ 10 In *Pelham*, the plaintiffs brought a legal-malpractice suit against the attorney who had represented their mother in a divorce action against their father. The plaintiffs' father was

covered by a life insurance policy provided by his employer, and the divorce decree obligated the plaintiffs' father to name the plaintiffs as the beneficiaries of the policy. The plaintiffs alleged that their mother's attorney had negligently failed to ensure that their father fulfill that obligation. They contended that their mother's attorney should have notified their father's employer and the insurer that issued the policy of the pertinent terms of the divorce decree. The *Pelham* court concluded, however, that the attorney owed no duty to the plaintiffs, who were, at most, only incidental beneficiaries of the attorney-client relationship with their mother. *Id.* at 23. The court added that the outcome might have been different if the plaintiffs had alleged that the attorney had "undertaken a duty to notify the insurer or [the plaintiffs' father's] employer of the provision in the divorce decree." *Id.* at 24. The court reasoned that "[i]n that situation, the attorney may have a duty to exercise reasonable care because his client and the plaintiffs herein could have justifiably relied on that undertaking." *Id.*

¶ 11    Does it matter, however, whether the legal theory under which a nonclient seeks recovery is legal malpractice or negligent misrepresentation? In *Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir. 1987), the United States Court of Appeals for the Seventh Circuit considered that question but did not definitively resolve it. The *Greycas* court held that, under Illinois law, a lender could maintain a legal-malpractice action against an attorney retained by a borrower to supply the lender with an opinion letter indicating whether there were any encumbrances on the collateral for the loan. After noting the *Pelham* court's concerns about the scope of an attorney's potential liability to nonclients, the *Greycas* court held that the lender could maintain a legal-malpractice action because the borrower retained the attorney for the sole purpose of influencing the lender to extend the loan. Significantly, however, the court noted equivocation on the part of the lender as to whether it was proceeding under the theory of legal malpractice or the theory of

negligent misrepresentation. *Id.* at 1563-64. This led the court to explore the relationship between these two theories in cases where the defendant is an attorney. Prefacing its analysis with the observation that "[t]he claim of negligent misrepresentation might seem utterly straightforward" (*id.* at 1564), the court cautioned:

"[M]erely labeling a suit as one for negligent misrepresentation rather than professional malpractice will not make the problem of indefinite and perhaps excessive liability, which induced the court in *Pelham* to place limitations on the duty of care, go away. So one is not surprised to find that courts have placed similar limitations on suits for negligent misrepresentation—so similar that we are led to question whether *** these really are different torts, at least when both grow out of negligent misrepresentations by lawyers." *Id.*

¶ 12 Citing *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Ill. App. 3d 75, 81-82 (1979), for the proposition that " 'one who in the course of his business or profession supplies information for the guidance of others in their business transactions' is liable for negligent misrepresentations that induce detrimental reliance," the *Greycas* court reasoned that "[w]hether there is a practical as distinct from a merely semantic difference between this formulation of the duty limitation and that of *Pelham* may be doubted but cannot change the outcome of this case." *Id.* at 1565. The court explained that the borrower's attorney, in the practice of his profession, had supplied information that was intended "to guide [the lender] in commercial dealings with [the borrower]," so the attorney was under a duty to use due care to provide accurate information. *Id.*

¶ 13 *Penrod* adopted the duty limitation set forth in section 552(b)(i) of the Restatement (First) of Torts (1938). Under section 552(b)(i), recovery for negligent misrepresentation in

connection with a business transaction is limited to "the person or one of the class of persons for whose guidance the information was supplied." Restatement (First) of Torts § 552(b)(i) (1938). In cases in which the theories of negligent misrepresentation and legal malpractice overlap, it makes sense that this limitation should be applied in a manner that addresses the concerns about attorney liability identified in *Pelham* (*i.e.*, conforming to the trend away from rigid privity rules without unduly expanding the class of potential plaintiffs). This can be accomplished by synthesizing *Pelham*'s third-party-beneficiary model with the *Penrod*/Restatement rule so that information disseminated by an attorney in connection with a client matter is not for the "guidance" of a third party unless the primary purpose of the attorney-client relationship was to guide or influence the third party.[1]

¶ 14    Under this analysis, Sauber owed no duty to Konow. The relationship between Bettag and Konow was quintessentially adversarial. The primary purpose of the attorney-client relationship between Sauber and Bettag was to recover damages for the injuries that Bettag suffered. Obviously, in settlement negotiations, that would involve efforts to persuade Konow (or perhaps more importantly Konow's attorney and his insurer) of the strength of Bettag's case. But those efforts were incidental to the central objective of the attorney-client relationship. In

---

[1] We would be remiss if we did not mention *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 220 Ill. App. 3d 600 (1991), *aff'd in part & rev'd on other grounds in part*, 155 Ill. 2d 223 (1993), which held that an attorney acting on behalf of a client owed a duty of care to the recipients of an opinion letter even though they were not clients and preparing the letter was not the primary purpose of the attorney-client relationship. However, the *Geaslen* court reasoned that, by rendering a *legal opinion* for a nonclient's benefit, the attorney had *undertaken a duty of care* to the recipients.

any event, that is not the sort of influence that will permit recovery of economic damages that, as noted, are available "only if the [defendant] is in the business of supplying information for the guidance of others in their *business transactions*" (emphasis added) (*First Midwest Bank, N.A.*, 218 Ill. 2d at 335). We do not regard the settlement of the tort claims against Konow as a "business transaction" contemplated by this rule.

¶ 15    Konow argues that, in personal-injury cases, the plaintiff's attorney typically "resolve[s] lien claims and provide[s] written confirmation." Thus, according to Konow, "in the context of settlement agreements, Sauber is in the business of supplying information for the guidance of Konow's attorney to carry out his obligations under the settlement agreement and issue the settlement drafts." That is not the primary purpose for which Bettag retained Sauber, however. Furthermore, the argument presupposes that Konow's attorney failed to carry out some obligation under the settlement agreement. That does not appear to be the case. As reflected in the release executed by the Bettags, the settlement required the payment of $3 million to the Bettags in settlement of *their* claims. The release did not provide for the settlement of Auto-Owners' subrogation claim. And because Konow was aware of Auto-Owners' claim, the release did not foreclose Auto-Owners from suing him. See *Home Insurance Co. v. Hertz Corp.*, 71 Ill. 2d 210 (1978). Konow seeks, in effect, to treat Sauber's statement in the September 10, 2009, letter that "we have resolved all lien claims" as an agreement to hold Konow harmless from the claims of other parties. But the release executed by the Bettags (which recited that it was the entire agreement between the parties) contained no such agreement.

¶ 16    Notably, Konow was not only aware of Auto-Owners' subrogation claim, but was also named as a defendant in Auto-Owners' claim in intervention. Under these circumstances, we see particularly little justification for imposing a duty on Sauber to act as an intermediary in the

resolution of Auto-Owners' subrogation claim. In the absence of a duty, Sauber cannot be held liable for negligent misrepresentation. Further, because Sauber owed no duty, Bettag cannot be held vicariously liable for Sauber's false statements.

¶ 17    For the foregoing reasons, the judgment of the circuit court of Kane County is reversed.

¶ 18    Reversed.